**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**KEVIN MADDEN,**

    **Petitioner,**                              **CASE NO. 2:09-CV-00747
                                                          JUDGE MARBLEY**
**v.**                                                         **MAGISTRATE JUDGE ABEL**

**WARDEN, TOLEDO
CORRECTIONAL INSTITUTION,**

    **Respondent.**

## REPORT AND RECOMMENDATION

Petitioner, a state prisoner, brings the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. This matter is before the Court on the instant petition, respondent's return of writ, and the exhibits of the parties. For the reasons that follow, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.**

## FACTS and PROCEDURAL HISTORY

The Ohio Tenth District Court of Appeals summarized the facts and procedural history of this case as follows:

> By indictment filed July 18, 2003, defendant was charged with one count of aggravated murder with prior calculation and design, including a firearm specification, in the death of Tabari Patterson. Following multiple continuances, occasioned in part by defendant's request for a change of counsel, the charge was tried to a jury beginning January 10, 2005. During the course of the trial, counsel and the trial court discussed jury instructions and tentatively concluded that the jury be instructed on the lesser included offense of murder, as well as the affirmative defense of self-defense. At the conclusion of the evidence, defendant further asked for instructions on the offenses of felonious assault, voluntary manslaughter, and involuntary manslaughter; the trial court refused the additional instructions. The jury returned a verdict of not guilty on the indicted charge, but guilty of the lesser included offense of murder, as well as the firearm specification. The trial court sentenced defendant to 15

years to life, plus three years for the firearm specification.

\*\*\*

Because defendant's two assignments of error are fact intensive, we set forth in some detail the facts presented to the jury. According to the state's evidence, on July 10, 2003, defendant and four individuals, Dezjuano Mack, Howard Bryant, Anthony Graves, and Louis Russell, began the evening with dinner and drinks at Genji's. After eating and drinking for an hour or two, the group went to a bar, the Sunrise, where they did not stay long. From the Sunrise, the group went to the Knotty Pine, and then to Playaz Club in Westerville.

Some members of the group entered Playaz Club. Although the witnesses offered conflicting testimony identifying who went inside, the testimony was uniform that defendant did not go into the club. Bryant entered the club but would occasionally leave to talk to someone in the parking lot and then return to the club. Both Mack and Howard testified they saw Tabari Patterson inside Playaz Club, though they did not see Patterson, or anyone else, with a gun.

At some point, Bryant saw defendant by the door, and defendant said, "[L]et's go." (Tr. 77.) Although defendant was ready to leave, Bryant was still socializing outside in the parking lot. As he and Mack were talking to a female patron, Bryant heard gunshots. Bryant ducked and saw Graves running toward their van. Graves hollered, "Come on. Let's go." (Tr. 85.) Bryant jumped in first, then Mack entered the van. While they were still in the parking lot, Bryant heard more shots; Mack testified that as they were pulling out, he, too, heard more gunshots in the background. Graves, on the other hand, testified they were being shot at as they drove away.

As they drove southbound on Joyce Avenue, defendant ran toward the van. Graves stopped the van, and defendant got in; he was nervous and distraught. Graves saw the gun in defendant's hand when defendant entered the van; defendant dropped it to the floor and pushed it toward the front passenger seat. Defendant said "you all seen me do it" or "you all was the only ones who seen me do it." (Tr. 151.) Similarly, Bryant testified he knew defendant had a gun because defendant either put it on the floor or pushed it; Bryant did not see it, but heard the occupants talking about it as if no one wanted to touch it. Both Bryant and Graves testified the men with Patterson had guns; Bryant believed Patterson in the past carried a gun.

2

Officer Tennis Jude, of the Columbus Police Department, heard the gunshots; he saw a van stop in the middle of Joyce Avenue, an individual get in the van, and the van then continue southbound on Joyce Avenue. Jude was suspicious, so he followed the van, which at the time four individuals occupied, and stopped it. Most of the occupants cooperated with the police, but defendant seemed to ignore commands to cooperate. Ultimately, a Glock brand model 17 semi-automatic pistol was found on the floor underneath the passenger's seat in front of defendant's place in the van. The magazine, loaded with 12 cartridges, was discovered under the seat. As the officers were getting the men out of the van, they received confirmation of the shooting.

On arriving at Playaz Club, Sergeant Travis Corbin, of the Clinton Township Police Department, found the dead body of Tabari Patterson lying between two cars, and a large crowd was gathered around it. Although medics were called, Travis believed Patterson to be dead at the time the officer arrived. A Dodge Dynasty parked east of where the victim was found had a .45 caliber handgun under the front seat; the magazine was full, and no bullet was in the chamber.

William Mark, a firearms examiner with the Bureau of Criminal Investigation, examined the shell casings found at the scene, as well as the Glock semi-automatic pistol. According to Mark, the gun will hold 19 bullets, 18 in the magazine and one in the chamber. When he received the items, the magazine had 14 unfired cartridges, and the chamber firing pin had one, for a total of 15. He examined four of the casings, found they had Glock characteristics, and concluded the four came from the Glock gun found in the van.

According to Dr. Dorothy Dean, of the Franklin County Coroner's office, the victim died from four gunshot wounds to the head that perforated the brain and brain stem. All four wounds could have caused the victim's death; she could not identify one as the cause of death.

Detective James Simmons, of the Franklin County Sheriff's Office, interviewed defendant the next morning. Simmons testified that defendant was nervous throughout the interview, but pressed that he wanted to make a statement. According to that statement, defendant sat in the van while some of the others went into Playaz Club. When they came outside the club to speak with women in the parking lot, defendant joined them. Defendant saw Patterson exit the club, mouth something to defendant, and then walk to a car. Defendant told

3

Simmons he had received murderous threats from Patterson prior to the evening at the Playaz Club, he believed Patterson was going to get a gun to follow through with the threat, and he needed to act before Patterson did. Accordingly, defendant "did what he had to do." Defendant never told Simmons that Patterson had a gun or that someone fired at him first.

Defendant testified on his own behalf. According to defendant, he at one time was employed with Time Warner, but stopped because he was sent to work in the Short North area where Patterson lived. Defendant explained that problems developed between him and Patterson through defendant's act of generosity. Specifically, defendant said that due to a car accident, he went to a chiropractor where he first saw Patterson. Because Patterson needed money, defendant loaned him $20. When defendant later saw Patterson at the Hoop basketball court, he asked Patterson for the money. Patterson angrily responded, "I'm a killer. I don't pay money back; I kill them." (Tr. 365.) As he walked away, Patterson said "[y]ou, your brother, and your cousin, you all are B's." (Tr. 368.) When asked at trial what the "B" stood for, defendant testified it meant "bitch." In response to Patterson's comment, defendant's brother engaged Patterson in a fist fight. After the fight with defendant's brother, Patterson said, "I know where you live at. I'm going to come and get you." (Tr. 376.)

Defendant testified the victim was intimidating when he spoke, and defendant believed him capable of violence. Indeed, defendant's cousin, a close friend of Patterson, told defendant that Patterson, carrying an AK-47, came to the home of defendant's cousin and said he was going to shoot defendant. On defendant's next visit to the chiropractic office, he saw Patterson and left before receiving treatment because he wanted to avoid trouble.

According to defendant, he went back to the Hoops basketball gymnasium one time after the confrontation with Patterson, saw Patterson, turned around, and left. When Patterson came to defendant's house to see defendant's cousin, Patterson told defendant to come outside. Defendant refused because Patterson showed him a gun. As a result of the incident, defendant moved to Hilliard.

A month or two later, defendant returned to Columbus for his cousin's birthday and stopped at a gas station on 5th Avenue. Defendant turned around after paying, and Patterson was behind him. Defendant said "hi," and Patterson bumped defendant on his shoulder. Defendant interpreted the gesture to mean Patterson still had a

problem with defendant. As a result, defendant left without putting any gasoline in his car even though he had paid for it. Patterson followed defendant from the gas station and began shooting at defendant's car; a bullet hit the car's license plate, but did not strike defendant. Defendant did not report the incident to the police right away, because he was afraid such action would worsen the situation. Several weeks later, a police officer questioned defendant about a handgun in his car, and defendant reported the shooting incident as justification for carrying the gun.

The next time defendant saw Patterson was on July 10, 2003, at Playaz Club. On that night, defendant met Mack, Bryant, Graves and Simmons at a bar, where defendant, armed with a gun, left his car. The group eventually ended up at Playaz Club, but defendant did not go inside because he had no money. He was not looking for Patterson and did not know he would find him.

At some point, defendant told the others the hour was getting late and he wanted to leave. Defendant, for the first time that evening, saw Patterson: defendant was in the parking lot and Patterson was coming out of the hallway entrance to Playaz Club. When Patterson saw defendant, he said "I told you not to come back outside * * * I'm going to get you this time. I won't miss you this time." (Tr. 392.) Defendant asked what the problem was and why Patterson wanted to shoot him. Patterson still threatened. Patterson went to his car to get his gun, approached defendant, and shot at defendant; defendant returned fire. A man wearing a red hat, who actually initiated the shooting, fired again. Afraid, defendant shot fast and believes he knew he hit Patterson. When the man wearing the red hat ducked behind a car, defendant ran across the street, as he was afraid for his life. According to defendant, he considered the situation a life or death matter, and his actions were a reaction to his life being in danger.

*State v. Madden*, No. 05AP-149, 2006 WL 2349447, at *1-5 (Ohio App. 10th Dist. August. 15, 2006).
Petitioner filed a timely appeal, in which he asserted the following assignments of error:

> 1. The trial court committed reversible error by failing to instruct the jury on the lesser included offense of voluntary manslaughter when the instruction was warranted by the facts.
>
> 2. Appellant's conviction is against the manifest weight of the evidence, because Appellant established the affirmative defense of

5

>self-defense by a preponderance of the evidence.

*See id.* On August 15, 2006, the appellate court denied petitioner's appeal. *Id.* On January 24, 2007, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Madden*, 112 Ohio St.3d 1442 (2007).

On October 6, 2006, petitioner filed a pro se application to reopen his appeal pursuant to Ohio Appellate Rule 26(B). On January 24, 2008, through counsel, he filed an amended application.

>In his pro se application, defendant proposes two assignments of error:
>
>ASSIGNMENT OF ERROR PART (1)
>
>WHETHER APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED HIM UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION WHEN APPELLATE COUNSEL FAILED TO SUBSTANTIATE HIS CLAIM THAT THE TRIAL COURT FAILED TO INSTRUCT THE JURY ON THE LESSER INCLUDED OFFENSE OF VOLUNTARY MANSLAUGHTER, WITH THE NECESSARY EVIDENCE FROM THE TRANSCRIPT.
>
>ASSIGNMENT OF ERROR PART (2)
>
>WHETHER APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED HIM UNDER THE SIXTH AMENDMENT TO THE U.S. CONSTITUTION WHEN APPELLATE COUNSEL FAILED TO RAISE THE FOLLOWING ISSUES AS ASSIGNMENTS OF ERROR: (2)(A) The Violation of Defendant's Confrontation Clause Right; (2)(B) Ineffective Assistance of Trial Counsel; (2)(C) Prosecutor Misconduct; and (2)(D) Abuse of Discretion.
>
>In his amended application, defendant proposes two assignments of error:
>
>PROPOSED ASSIGNMENT OF ERROR I
>
>IT CONSTITUTED PLAIN ERROR TO PERMIT THE PROSECUTOR TO IMPEACH DEFENDANT WITH A POLICE RE-

> PORT CONTAINING TESTIMONIAL HEARSAY INFORMA-
> TION NOT PROVIDED BY DEFENDANT WHICH VIOLATED
> DEFENDANT'S SIXTH AMENDMENT RIGHT TO CONFRONT-
> ATION.
>
> PROPOSED ASSIGNMENT OF ERROR II
>
> IT CONSTITUTED INEFFECTIVE ASSISTANCE OF COUNSEL
> FOR DEFENDANT'S TRIAL COUNSEL NOT TO HAVE
> OBJECTED TO THE IMPROPER IMPEACHMENT OF DEFEND-
> ANT WITH A POLICE REPORT MADE BY DEFENDANT'S
> MOTHER AND TO HAVE STIPULATED TO ADMISSION OF
> SAID REPORT.

*See State v. Madden*, No. 05AP-149, 2008 WL 2025370, at *2 (Ohio App. 10th Dist. May 1, 2008).

On May 1, 2008, the appellate court denied petitioner's Rule 26(B) application. *Id*. On September 10, 2008, the Ohio Supreme Court dismissed petitioner's subsequent appeal. *State v. Madden*, 119 Ohio St.3d 1449 (2008).

On August 25, 2009, petitioner filed the instant petition for a writ of habeas corpus pursuant to 28 U.S.C. §2254. He alleges that he is in the custody of the respondent in violation of the Constitution of the United States based upon the following grounds:

> 1. Petitioner was denied due process and a fair trial under the 14th Amendment to the U.S. Constitution when the trial court fail[ed] to instruct on the lesser-included offense of voluntary manslaughter.
>
> 2. Ineffective assistance of appellate counsel for failure to [raise a claim on appeal that] it constituted plain error to permit the prosecutor to impeach defendant with a police report containing testimonial hearsay information not provided by the defendant violating his 6th Amendment right to confront.
>
> 3. Ineffective assistance of appellate counsel for [failing to raise on appeal a claim that] it constituted ineffective assistance of counsel for trial counsel not to have objected to improper impeachment of defendant with a police report made by defendant's mother and to have stipulated to admission of said report.

7

It is the position of the respondent that petitioner's claims are waived and without merit.

## CLAIM ONE

In claim one, petitioner asserts that he was denied a fair trial because the trial court failed to issue a jury instruction on the lesser included offense of voluntary manslaughter. The state appellate court rejected this claim as follows:

> [D]efendant's first assignment of error contends the trial court erred in failing to instruct the jury on voluntary manslaughter, an offense of inferior degree to murder. Under R.C. 2903.03(A), a person is guilty of voluntary manslaughter if, "while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force," he or she knowingly causes the death of another.
>
> "Provocation, to be serious, must be reasonably sufficient to bring on extreme stress and the provocation must be reasonably sufficient to incite or to arouse the defendant into using deadly force. In determining whether the provocation was reasonably sufficient to incite the defendant into using deadly force, the court must consider the emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time." *State v. Deem* (1988), 40 Ohio St.3d 205, 533 N.E.2d 294, paragraph five of the syllabus.
>
> To ascertain whether the requisite provocation exists, "[a]n inquiry into the mitigating circumstances of provocation must be broken down into both objective and subjective components. In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied. Then, if that standard is met, the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage." *State v. Shane* (1992), 63 Ohio St.3d 630, 634, 590 N.E.2d 272. See, also, *State v. Wong* (1994), 95 Ohio App.3d 39, 51-52, 641 N.E.2d 1137, dismissed, appeal not allowed, 70 Ohio St.3d 1455, 639 N.E.2d 793.
>
> "If insufficient evidence of provocation is presented, so that no reasonable jury would decide that an actor was reasonably provoked

by the victim, the trial judge must, as a matter of law, refuse to give a voluntary manslaughter instruction." *Id*. Ordinarily, "[w]ords alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations." *State v. Mack* (1998), 82 Ohio St.3d 198, 201, 694 N.E.2d 1328. Similarly, "past incidents or verbal threats do not satisfy the test for reasonably sufficient provocation when there is sufficient time for cooling off." Id.

Here, defendant's evidence, construed in defendant's favor, demonstrated prior incidents between him and Patterson. They had physical contact, Patterson threatened defendant, and Patterson shot at defendant's vehicle as he left a 5th Avenue gas station. On the evening of the incident, defendant saw Patterson coming out of the hallway entrance to Playaz Club, and again Patterson spoke threatening words to defendant. Patterson then went to his car, retrieved his gun, approached defendant, and shot at him.

Presented with those facts, the trial court did not err in refusing to instruct the jury on voluntary manslaughter. Although the evidence revealed prior incidents between defendant and Patterson, those incidents preceded the July 2003 shooting by an unspecified period of time. Because defendant had time to cool off from the prior incidents, they do not satisfy the test for reasonably sufficient provocation. *Mack, supra.*

On the day of the incident, Patterson not only threatened defendant, but retrieved and used a gun against defendant. Even if we were to assume such action, when combined with the ongoing dispute between defendant and Patterson, objectively constitutes sufficient provocation, the issue resolves to applying the subjective standard and determining whether defendant was actually under the influence of sudden passion or a sudden fit of rage.

Defendant did not testify he was enraged, but rather he was "very much scared," (Tr. 434) he was "scared for [his] life," (Tr. 395) and he "believed he was in 'a life or death situation.' " (Tr. 397.) See *State v. Collins* (1994), 97 Ohio App.3d 438, 646 N.E.2d 1142 (noting that defendant's "own testimony did not support and completely undermined any claim that his actions were in fact incited by serious provocation," as defendant did not testify he was provoked, angry or had lost control of his temper). Defendant's "claim that he feared for his own safety did not constitute sudden passion or rage" under the statute. *State v. Caldwell* (December. 17, 1998), Franklin App. No. 98AP-165 (concluding that where the

9

> defendant acted out of fear rather than rage, the trial court did not err in refusing to instruct the jury on voluntary manslaughter); *Mack,* at 201, 694 N.E.2d 1328 (noting that "[f]ear alone is insufficient to demonstrate the kind of emotional state necessary to constitute sudden passion or fit of rage"); *State v. Perdue,* 153 Ohio App.3d 213, 792 N.E.2d 747, 2003-Ohio-3481 (noting that evidence of defendant's fear was insufficient to support provocation under voluntary manslaughter). Because the evidence fails to demonstrate the requisite subjective provocation, the trial court did not err in refusing defendant's instruction of voluntary manslaughter. Defendant's first assignment of error is overruled.

*State v. Madden,* 2006 WL 703083.

Where a state court has reviewed a habeas petitioner's request for a lesser included offense instruction and concludes that it was not warranted by the evidence presented at trial, "that conclusion is axiomatically correct, as a matter of state law." *Bagby v. Sowders,* 894 F.2d 792, 795 (6th Cir.1990). Further, errors in jury instructions generally are not cognizable unless they deprive petitioner of a fundamentally fair trial. See *Henderson v. Kibbe,* 431 U.S. 145, 154 (1977)*; Wood v. Marshall,* 790 F.2d 548, 551-52 (6th Cir.1986). To warrant federal habeas relief based on instructions that allegedly were erroneous under state law, the petitioner must demonstrate that the error violated a federal constitutional right. *See Cupp v. Naughten,* 414 U.S. 141, 146 (1973). Petitioner cannot meet this standard here. The United States Court of Appeals for the Sixth Circuit has held that the failure to issue a jury instruction on a lesser included offense in a non-capital case, even where the instruction is supported by the evidence fails to raise an issue cognizable in federal habeas corpus review. *Bagby v. Sowders,* 894 F.2d 792, 796 (6th Cir. 1990), citing *Chavez v. Kerby,* 848 F.2d 1101 (10th Cir.1988); *Perry v. Smith,* 810 F.2d 1078 (11th Cir.1987); *Alexander v. McCotter,* 775 F.2d 595 (5th Cir.1985); *Nichols v. Gagnon,* 710 F.2d at 1269; *James v. Reese,* 546 F.2d 325 (9th Cir.1976); *DeBerry v. Wolff,* 513 F.2d 1336 (8th Cir.1975)*. See also Scott v. Elo*, 302

F.3d 598, 606 (6th Cir. 2002). Moreover, because the United States Supreme Court has not determined whether the failure to issue a lesser included jury instruction in a non-capital case violates the Due Process Clause, petitioner cannot establish that the appellate court's decision is contrary to or an unreasonable application of clearly established Supreme Court law as required under 28 U.S.C. §2254(d).  *See Florence v. Voorhies*, 2010 WL 1882312 (S.D. Ohio March 29, 2010), citing *Tegeler v. Renico,* 253 F. App'x 521, 525 (6th Cir. 2007).

Claim one is without merit.

## CLAIMS TWO AND THREE

In claim two, petitioner asserts that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim that it constituted plain error to permit the prosecutor to impeach defendant with a police report containing hearsay. In claim three, petitioner asserts that he was denied the effective assistance of appellate counsel because his attorney failed to raise on appeal a claim of ineffective assistance of trial counsel due to his attorney's failure to object to the prosecutor's use of the police report and to stipulate to admission the report.

The state appellate court rejected these claims as follows:

> Defendant's first amended assignment of error contends that impeaching defendant with the police report constituted plain error, as the report contained testimonial hearsay information. Similarly, in his pro se application, defendant maintains his Sixth Amendment confrontation rights were violated when trial counsel, after stipulating to the admissibility of the report, failed to cross-examine defendant's mother. Defendant asserts appellate counsel was ineffective in failing to raise both issues.
>
> At trial, defendant testified to support his contention the shooting occurred in self-defense. In particular, defendant testified about a previous occasion where the victim shot at defendant's car, leaving a bullet hole in the car's license plate. The evidence also revealed a subsequent incident where defendant's car was vandalized. The pros-

11

ecution impeached defendant's testimony about the shooting incident by referring to a police report regarding the vandalism. The parties disagree about who made the police report and when. Defendant claims his mother provided the information in the police report several weeks after the vandalism occurred and, at that time, made incorrect statements to the reporting officer about the bullet hole. In contrast, the state argued the report shows it was taken just ten minutes after defendant's car was vandalized, not a week later. The copy of the report entered into evidence supports the state's contentions.

Moreover, defendant's testimony may indicate the police report concerning the vandalism contains information about the license plate bullet hole that defendant provided. After directing defendant's attention to the report, the prosecution asked if the vandalism report describes "the time you're talking about where you told them that Tabari shot your plate?" (Tr. 425.) Defendant answered yes, and added the police went to his car, "looked at the hole" and "continued to write things down." *Id* . at 426. Defendant went on to testify he told the detective investigating Tabari's killing to "please talk to those police because I did make them aware of this incident that happened." *Id* . Such testimony may be interpreted to suggest defendant was at the scene when the vandalism report was taken and provided information to the police officers at that time about the bullet hole in his car's license plate. If this be the case, the prosecution did not impermissibly impeach defendant with his mother's out-of-court statements, but with defendant's own prior inconsistent statement.

Even if the police report contain the hearsay statements of defendant's mother, the error was harmless because the evidence overwhelmingly demonstrated defendant's self-defense defense lacks evidentiary support. To establish a claim of self-defense, a defendant must prove the following: (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief he was in imminent danger of death or great bodily harm and his only means of escape from such danger was in the use of such force; and (3) the defendant must not have violated any duty to retreat or avoid the danger. *State v. Robbins* (1979), 58 Ohio St.2d 74, paragraph two of the syllabus. Since Ohio has a subjective test to determine whether a defendant acted in self-defense, the defendant's state of mind is crucial. *State v. Koss* (1990), 49 Ohio St.3d 213, 215. The elements of self-defense are cumulative, so a claim of self-defense is defeated when the defendant fails to prove by a preponderance of the evidence any one of the elements of the defense.

> *State v. Johnson,* Franklin App. No. 06AP-878, 2007-Ohio-2792.
>
> Defendant argues the prosecution undercut his self-defense claim when it impeached him with the police report, using the inconsistencies in the police report to make him "look like a liar." (Amended Application, 5.) Defendant contends the victim's prior threats and violence directed toward defendant were important links establishing that he acted in self-defense. He asserts the jury thought the prior occurrences significant, since they asked a question about one of the incidents during deliberations.
>
> Defendant's contentions are without merit, as the evidence against self-defense, even from defendant's own testimony, was overwhelming. According to the evidence, defendant shot an unarmed victim four times at close range, with one of the bullets striking the victim from behind and another hitting him in the top of the head. Defendant failed to prove retreat was not possible, a required element in the legitimate use of deadly force. Indeed, defendant testified that, after confronting defendant, the victim walked to the victim's car to retrieve a gun. During the interval, which according to defendant was brief, defendant made no attempt to flee. Instead, defendant chose to act upon the conviction he formed after his uncle was killed: "[I]f I was faced with a situation where I had to shoot, I would shoot." (Tr. 395.) While defendant claims the victim shot first, no weapon was found near the victim. The circumstances of the killing invalidate any claim of self-defense in this case, and the prosecution's using the police report thus did not prejudice defendant. Defendant failed to show appellate counsel was ineffective regarding the police report.

*State v. Madden,* 2008 WL 2025370. . The factual findings of the state appellate court are presumed to be correct 28 U.S.C. §2254(e)(1) provides:

> In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

Further, a federal habeas court may not grant relief unless the state court's decision was contrary to or an unreasonable application of clearly established federal law, or based on an unreasonable

13

determination of the facts in light of the evidence that was presented. 28 U.S.C. §2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

The United States Court of Appeals for the Sixth Circuit has summarized this standard as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law, or if the state court decides a case differently than the Supreme Court on materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from the Supreme Court's decisions but unreasonably applies it to the facts of the petitioner's case.

*Boykin v. Webb,* 541 F.3d 638, 642 (6th Cir.2008), quoting *Williams v. Taylor,* 529 U.S. 362 (2000).

The standard for demonstrating a claim of ineffective assistance of counsel is composed of two parts:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

*Strickland,* 466 U.S. at 687. Scrutiny of defense counsel's performance must be "highly deferential."

14

*Id.* at 689.

With respect to the first prong of the *Strickland* test, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id* . To establish the second prong of the *Strickland* test, prejudice, a Petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

The *Strickland* test applies to appellate counsel. *Burger v. Kemp,* 483 U.S. 776, 781-82 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey,* 469 U.S. 387, 396-97 (1985). " '[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray,* 477 U.S. 527, 536 (1986) ( *quoting Jones v. Barnes,* 463 U.S. 745, 751-52 (1983)). The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

    1. Were the omitted issues "significant and obvious?"

    2. Was there arguably contrary authority on the omitted issues?

    3. Were the omitted issues clearly stronger than those presented?

    4. Were the omitted issues objected to at trial?

15

>5. Were the trial court's rulings subject to deference on appeal?
>
>6. Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?
>
>7. What was appellate counsel's level of experience and expertise?
>
>8. Did the Petitioner and appellate counsel meet and go over possible issues?
>
>9. Is there evidence that counsel reviewed all the facts?
>
>10. Were the omitted issues dealt with in other assignments of error?
>
>11. Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle,* 171 F.3d 408, 427-28 (6th Cir.1999). This list is not exhaustive and need not produce a certain "score." *Id.* at 428.

For the reasons detailed by the state appellate court, this Court is not persuaded that petitioner can establish prejudice from admission of the police report that he contends does not contain his statements to police. Therefore, he has failed to establish that he was denied effective assistance of trial or appellate counsel such that habeas corpus relief is warranted. *See Williams v. Taylor*.

Claims two and three are without merit.

**WHEREUPON**, the Magistrate Judge **RECOMMENDS** that this action be **DISMISSED.** If any party objects to this *Report and Recommendation,* that party may, within fourteen (14) days of the date of this report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the

16

objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. §636(b)(1).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to have the district judge review the *Report and Recommendation de novo,* and also operates as a waiver of the right to appeal the decision of the District Court adopting the *Report and Recommendation. See Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *United States v. Walters,* 638 F.2d 947 (6th Cir.1981).

The parties are further advised that, if they intend to file an appeal of any adverse decision, they may submit arguments in any objections filed, regarding whether a certificate of appealability should issue.

        s/Mark R. Abel
        United States Magistrate Judge